**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ERIC LEE BRITT,

                Petitioner,

v.                                    Case Number: 06-CV-14751
                                    Honorable Nancy G. Edmunds

CAROL HOWES,

                Respondent.
_____/

**OPINION AND ORDER**
**DENYING PETITION FOR WRIT OF HABEAS CORPUS**

**I.  Introduction**

      Petitioner Eric Lee Britt, a state inmate currently incarcerated at the Lakeland

Correctional Facility in Coldwater, Michigan, through counsel, filed a petition for a writ of

habeas corpus, pursuant to 28 U.S.C. § 2254, alleging that he is incarcerated in violation of his

constitutional rights.  Petitioner was convicted of second-degree murder, MICH. COMP. LAWS

§ 750.317, and felony firearm, MICH. COMP. LAWS § 750.227b, by a Huron County, Michigan,

Circuit Court jury.  He was sentenced to twenty-five- to forty-years imprisonment for the

second-degree-murder conviction and the mandatory two-years imprisonment for the felony-

firearm conviction.  He is now challenging his state convictions and sentences on the following

grounds: (1) insufficient evidence, (2) prosecutorial misconduct, and (3) ineffective assistance of

trial counsel.  For the reasons stated below, the Court denies the petition.

## II.  Substantive Facts

This case arises as a result of an incident that occurred on October 25, 1999, in Sheridan Township, Michigan, which resulted in the death of Nathan Wilde, the decedent in this case. Trial began on May 2, 2000.  Mr. Charles Wilde, the decedent's father, was first to testify.

According to Mr. Wilde's testimony, Nathan left his house to go four-wheeling around 9:15 p.m., on the night in question.  He testified that he did not know where Nathan was going. Mr. Wilde confirmed that Petitioner and Nathan were good friends.  He also confirmed that Nathan, who was on probation, was released from the county jail the day before the incident, on October 24, 1999, around 6:00 p.m.  He testified that Nathan was incarcerated for hurting someone.  Mr. Wilde said that when Nathan did not come home by 11:00 p.m., that night, he went looking for him.

On cross-examination, Mr. Wilde acknowledged that his son had a drinking problem and that, as a condition of his probation, he was not to see or have anything to do with Petitioner.

Mr. Robert Britt, Petitioner's father, testified next.  According to Mr. Britt's testimony, Nathan and Petitioner were good friends; he had seen him (Nathan) at Petitioner's house several times.  Mr. Britt acknowledged that Petitioner had a gun collection.

According to Mr. Britt's testimony, around 9:30 p.m., on the night in question, he received a telephone call from his son, asking him (Mr. Britt) to bring a two-liter bottle of Coca-Cola to the house; Petitioner told his father that he had a few drinks and did not want to drive to town.  When Mr. Britt arrived at Petitioner's home, he saw Petitioner on a snowmobile, and he saw Nathan on a four-wheeler, riding around the property.  Mr. Britt testified that both men were drinking beer and seemed to be having a good time.  According to Mr. Britt, when he was

2

leaving the house, he said that his son and Nathan were in the process of parking the vehicles in the shed.  Mr. Britt said that his son was wearing a sweatshirt and black summer shorts.  He also testified that he saw a scrape on his son's chin.

Mr. Britt testified that, later that evening, Nathan telephoned him from Petitioner's house and asked that he bring them some Jack Daniels.  Mr. Britt said he refused and cautioned Nathan about drinking and driving.  According to Mr. Britt, as he was speaking to Nathan, the phone seemed to go dead but then it got better, and he continued lecturing him about drinking.  Mr. Britt acknowledged that they previously had trouble with his son's phone.

Further testimony from Mr. Britt revealed that about 1:30 a.m., Petitioner arrived at his house and appeared excited and traumatized, stating, "Nathan Wilde's (sic) laying (sic) dead on my kitchen floor."  (Trial Tr. vol. I, 135, May 2, 2000.)  According to Mr. Britt, his son told him that when he handed a gun to Nathan, who "took hold of it", the gun discharged, and "it was an accident."  *Id.*, at 135-137.  Mr. Britt said that he then called 911.  He said he talked to the dispatcher, provided them with the exact address and location of his son's house, and said that he would meet them there.  Mr. Britt testified that he and his son then drove over to his son's house to meet the police.  Mr. Britt acknowledged that he told his son not to make a statement to the police without an attorney present.

Todd Schember, a Huron County Deputy Sheriff, testified that he responded to a reported shooting on McMillan Road at 1:52 a.m., on the night in question, along with Officer Knoblock from the Bad Axe Police Department.  Deputy Schember was there when Petitioner and Mr. Britt arrived.  It was his testimony that he detected an odor of alcohol on Petitioner, and he said that he noticed a scrape on his chin and a drop of blood below his left nostril.  Deputy Schember said

3

that Petitioner unlocked the door for them, and, upon entering the house, Deputy Schember saw

the decedent on the floor, with a revolver next to his body, a broken kitty litter box, silverware,

and bloody footprints around the area.  When asked if Petitioner said anything, Deputy

Schember testified "[h]e just said oh my God, oh my God . . . ."  (Trial Tr. vol. I. 160, May 2,

2000.)

      Further testimony revealed that, without objections by the defense, the prosecutor

questioned Deputy Schember about his conversation with Petitioner.

      Q.  And do you remember what he said to you?

      A.  I asked him again, I said what happened here tonight?  He said an accident
      happened here and I'm not gonna say anything more without an attorney and
      that's all I'm gonna say.

* * *

(Trial Tr. vol, I, 164, May 2, 2000.)

      Q.  Okay.  But you do remember Mr. Britt emphatically telling you this was an
      accident?

      A.  It wasn't emphatically, he just told me it was an accident and I'm not saying
      anything without an attorney, that's all he would say.

      Q.  Okay.  So he was clear about saying it's an accident, correct?

      A.  Yes.

      Q.  And he was clear to you about saying I'm not gonna say anything else without
      an attorney present?

      A.  Yes.

(Trial Tr. vol, I, 176, May 2, 2000.)

      James Jimkoski, from the Huron County Sheriff's Department, also testified to a strong

odor of intoxicants on Petitioner's breath.  Deputy Jimkoski put Petitioner in his patrol car to

4

keep him warm.  It was Deputy Jimkoski's testimony that, as they sat in the patrol car, Petitioner

described the situation as an accident.  Deputy Jimkoski also testified that Petitioner told him

that he was not going to talk to anyone without the presence of an attorney.

According to Deputy Jimkoski, Petitioner was intoxicated, agitated, and was "spurting

things out," *i.e.*, " my life is ruined over a few seconds, an accident here and now my life is

ruined"; "that he was a collector of guns and after that night he didn't want to own a gun

anymore"; "I can't believe he grabbed the gun like that"; "he wished he had a time machine that

he could make that weekend go back and not have what happened happen, that he wishes he

could just sleep and not wake up"; "his plans for his life for the next five years and that this

wasn't part it."  (Trial Tr. vol. I, 183-85, May 2, 2000.)  Petitioner was held at the scene from

2:00 a.m. until sometime after 10:00 a.m., which is the period of time he made those statements

to the Deputy.  Afterward, he was transported to the Sheriff's Department.  Deputy Jimkoski

administered two Breathalyzer tests to Petitioner; the reported results were .11 and .10 percent.

Richard Kohler, another Huron County Deputy, gathered evidence and took

photographs; he noticed an abrasion on Petitioner's chin, some burn marks on his hands, and

some blood stains on the soles of his feet and between his toes.

Ronald Roberts, a Huron County Detective Sergeant, confirmed that the telephone at

Petitioner's residence was not working.  Detective Roberts also acknowledged that Petitioner

was under arrest from the time he was placed in the back seat of the scout car at approximately

2:00

a.m., until his release at 11:30 a.m.  Detective Roberts then read a written statement to the jury,

which was submitted by Petitioner to his original attorney:

Q.  Sergeant Roberts, on the statement that you obtained from the Prosecutor's Office signed by Mr. Eric Britt, would you begin please reading that statement?

A.  Statement of Eric Britt.  On Sunday around 8:00 p.m.[,] I finished mowing the lawn and went into the house to make supper.  I heard an ATV coming up the driveway and went outside to see who it was.

  It was my friend Nathan Wilde.  We talked for a while and went inside and had a few drinks.  Then we decided to ride around the yard.  Nathan rode his four-wheeler and I rode my snowmobile.  We rode around the yard until about 10:00 p.m.

  During this time I was thrown off my snowmobile a couple of times scraping my chin and so I didn't feel like riding anymore.  I had called my dad to bring us out a two-liter of Coke.  My dad and I stood and watched Nathan take my snowmobile around the yard a few times.

  My dad left about that time or around 12 – or, around 10:25 p.m.  After that we put our machines in the shed and we went into the house.  We watched TV.  And later that night we went into my room to look at my gun collection in my gun cabinet.

  After that we went into the kitchen and had something to drink.  Nathan told me to get my 44.  I walk[ed] in my room, took it out of the cabinet, walked back to the kitchen to hand it to him and it went off shooting him.

  The gun dropped to the floor.  I couldn't believe it.  I was in total shock.  I tried to call 911 to get some help for Nathan, but my hands kept shaking and I couldn't make the phone work.

  I was then going to take Nathan to the hospital, but it was too late because Nathan appeared to have died.  So I got into my pickup and drove to my parents' house and my dad called 911.

  When we arrived ay my house on MacMillan (sic) Road, Officer Schember and Officer Knoblock were in the driveway out by the road watching the house.  Later Officer Schember kept questioning me about the scrape on my chin indicating that he thought I had been in a fight.  I told him there was no argument or fight and it's signed Eric Britt.

(Trial Tr. vol. I, 215-17, May 2, 2000.)

Petitioner was not examined by a doctor or dentist and there did not appear to be any

evidence of a fight.

The next witness to testify was Tani Watkins, an employee of the Department of

Michigan State Police forensic division, whose duty it was to receive evidence and analyze it.

She performed a serology test on the stain taken from Nathan's right foot and the stain from Petitioner's right foot; both were Nathan's blood. All other tests were inconclusive. On cross-examination, Ms. Watkins acknowledged that the blood found on Petitioner's right foot could have been a result of his stepping in Nathan's blood with his bare feet.

Andrew Longuski, from the crime laboratory, testified next. He examined the gun for fingerprints and found one print on the firearm, which was that of Petitioner's. The print was found on the cylinder part of the weapon and not on the handle or the trigger portion of the gun.

Ronald Crichton, a Michigan State Police Crime Laboratory firearm identification specialist testified next. He was called to the scene and was involved with the moving of the decedent's body; it was his job to "collect evidence in the immediate vicinity of the victim and also the surface of the victim that is exposed when we arrive at the scene." (Trial Tr. vol II, 293, May 3, 2000). Sergeant Crichton testified that, while at the scene, he seized a fired bullet from inside of the back of the sweatshirt that the decedent was wearing. Sergeant Crichton also testified that he attended the autopsy and collected the sweatshirt.

According to Sergeant Crichton, he also test fired the revolver that was seized from Petitioner's residence. It was his testimony that the bullet that had been fired from that revolver was fired from a distance "at or near contact with the garment and less than three inches" from the decedent. (Trial Tr. vol II, 318, May 3, 2000). Sergeant Crichton also testified that no obvious residue was seen on the decedent's hands and that no other residue testing was done by any laboratory. He also indicated that the lack of residue on the decedent's hands did not indicate that none was there; it only indicated that none was visible to the naked eye. No testing was done on the decedent's hands.

7

Dr. Kanu Irani, Deputy Chief Medical Examiner for Oakland County, performed an autopsy on the decedent.  It was his testimony that he found an entrance wound in the front of the abdomen, above the belly button, with two small flares of residue around it, indicating that, at the time of discharge, the gun barrel was very close to the skin.  The doctor also found an exit wound on the left side of the lower back, but no residue on the decedent's hands.  According to Dr. Irani, the bullet perforated the aorta, vena cava inferior, and intestinal tissue, causing bleeding and death within three to four minutes.

After Dr. Irani's testimony, the prosecution rested.  Petitioner produced no evidence.

During defense counsel's summation to the jury, he spoke about Petitioner as follows:

> Now his dad gave him some advice, his dad trying to protect his son and realizing how much trouble his son was gonna be in told him, he said Eric, don't talk to those police, just tell them you want to see a lawyer.

> Eric was drunk, he was traumatized, he wasn't thinking how do I beat this case, how do I get out of this, he wasn't thinking, he wasn't in his right frame of mind.  They stuck him in the back of that police vehicle and then [he] sat in that police vehicle and gave statements over and over for the next couple of hours.

> * * *

> Now the Prosecutor is gonna say to you well, voluntary intoxication is not a defense.  And the Judge is gonna tell you that, because it's true.  In Michigan voluntary intoxication is not a defense.  And frankly that's a good rule.  Because stop and think about it for a second, if all you had to do was to have a few drinks and then go rob a bank, that would be stupid.  But what we are saying is voluntary intoxication does not allow you to be acquitted so you can't commit a murder and then come in and say I was drunk, you gotta acquit me.

> What it does say is that an excuse that the Jury can look at to determine whether or not that person was intoxicated enough to give them the intent to do the act.  You can't get out of what you did by claiming you were drunk, but sometimes it is a factor that mitigates your state of mind.

(Trial Tr. vol. II, 432, 435-36,  May 3, 2000.)

8

In order to rebut defense counsel's arguments, the prosecutor argued the following

to the jury, without any objections from defense counsel:

> Falling down drunk.  Well let's look what he did when he was falling
> down drunk.  He drives the snowmobile on grass, he drinks, he's got shorts on,
> he's got shoes on, he's got a hooded sweatshirt on, he's inside the house.
>
> And as Tani Watkins said, the deceased's blood was found on his bare
> foot.  Okay.  So good so far.
>
> The murder occurs.  What does he do?  Puts on his shoes.  What's he to
> do?  Gets in a car, a truck.  Where's he go?  He drives to his dad's.  He didn't
> drive to the jail, he didn't drive to the convenience store, he didn't drive
> somewhere to get some more beer, he drove to his dad's.
>
> Falling down drunk, put on your shoes, drive to your dad's.  When he
> returns to the home on McMillan, what does he do, what does he say when the
> deputies come?  The deputies find out what's going on, they go up to the house
> and what does he say, what does this falling down drunk person say?  Don't break
> the door, I'll open it for you.  Don't break the door, I'll open it for you.
>
> What does he say to Deputy Schember?  It was an accident, but I'm not
> talking to you till I talk to a lawyer.  That's his right.
>
> * * *
>
> He was concerned for himself.  These actions so – show that this level of
> intoxication didn't impair him to the point that he could put on shoes, drive over
> to his father's house, grab his father, come back to the house, tell the police don't
> break down the house, it was an accident, I'm not saying [anymore] until I see a
> lawyer.  That's falling down drunk?  That's stumbling into the jury box?

(Trial Tr. vol. II, 444-446, May 3, 2000.)

On May 5, 2000, Petitioner was found guilty of the above-stated charges.

### III.  Procedural Facts

Following his sentencing, Petitioner appealed as of right to the Michigan Court of

Appeals, alleging the following:

> I.    The evidence presented by the prosecution was insufficient

to sustain a jury verdict of guilty of second degree murder, [MICH. COMP. LAWS §] 750.317 [].

II.     Trial counsel made a serious mistake in failing to contest the voluntariness of statements made by [Petitioner] both at the scene, and two days later, at the insistence of his original attorney who also made a serious mistake that prejudiced [Petitioner's] right to a fair trial.

III.    [Petitioner] was denied his right to a fair trial by the intentional prosecutorial misconduct in eliciting testimony from police witnesses and argument to the jury, that he refused to give a statement, invoked his right to remain silent and right to counsel at the scene of the shooting.

IV.    The trial court erred reversibly in failing to give the jury proper supplemental instructions on the elements of the [offenses] and requested cautionary instructions, regarding other uncharged acts CJI 2D 4.11.  Counsel was ineffective for failing to insure that the trial court read the requested cautionary instructions.

V.     [Petitioner's] sentencing proceeding was fraught with reversible error where he was improperly assessed 100 points for OV-3, the court made independent finding of guilt on other uncharged conduct to justify [Petitioner's] sentence, and where the pre-sentence investigation report did not include the information upon which the court based its sentence, denying [Petitioner] any opportunity to challenge inaccurate information.

The Michigan Court of Appeals affirmed Petitioner's convictions on April 23, 2002, but remanded for re-sentencing.  *People v. Britt*, No. 228017, 2002 WL 737867 (Mich.Ct.App. Apr. 23, 2002).  Subsequently, Petitioner filed an application for leave to appeal with the Michigan Supreme Court, raising the same claims as raised in the state court of appeals, minus the sentencing claim.  The Michigan Supreme Court denied the application on January 14, 2003. *People v. Britt*, 467 Mich. 939, 656 N.W.2d 523 (2003).  Petitioner then filed an application for writ of certiorari in the United States Supreme Court, which was denied in an Order dated June

16, 2003.

On remand, the trial court again imposed a sentence of twenty-five- to forty-years imprisonment, noting that it was within the guidelines range. Petitioner again appealed that decision to the Michigan Court of Appeals, which affirmed the sentence. *People v. Britt*, No. 252314, 2005 WL 1160639 (Mich.Ct.App. May 17, 2005). Petitioner's application for leave to appeal that decision was denied by the Michigan Supreme Court. *People v. Britt*, 474 Mich. 907, 705 N.W.2d 116 (2005).

On October 20, 2006, Petitioner filed the pending petition for a writ of habeas corpus, raising the following claims:

> I.    Viewed in the light most favorable to the prosecution the evidence was insufficient to satisfy a rational fact finder that all of the elements of second degree murder were proven beyond a reasonable doubt.
>
> II.   Petitioner was denied a fair trial by the prosecuting attorney's misconduct in eliciting testimony from law enforcement officers and emphasizing during summation to the jury that Petitioner had invoked his rights to remain silent and to counsel at the scene and in the aftermath of the alleged crimes.
>
> III.  Petitioner was denied effective legal assistance where his trial counsel made a serious mistake by failing to object to the prosecutor's misconduct.

### IV.  Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this Court's habeas corpus review of state court decisions. Specifically, 28 U.S.C. § 2254(d) states in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be

11

granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceedings.

Under (d)(1), a federal court may grant a writ of habeas corpus under two different clauses, both of which provide two bases for relief. Under the "contrary to" clause, a federal court may grant habeas relief if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has decided on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). The words "contrary to" should be construed to mean "diametrically different, opposite in character or nature, or mutually opposed." *Id.*

Under the "unreasonable application" clause, a federal court may grant habeas relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts. *Williams*, 529 U.S. at 407-08. Relief is also available under this clause if the state court decision either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id.*, at 407; *Arnett v. Jackson*, 393 F.3d 681, 686 (6th Cir. 2005). The proper inquiry for the "unreasonable application" analysis is whether the state court decision was "objectively unreasonable" and not

12

simply erroneous or incorrect.  *Williams*, 529 U.S. at 407; *Lordi v. Ishee*, 384 F.3d 189, 195 (6th Cir. 2004).

In analyzing whether a state court decision is "contrary to" or an "unreasonable application" of clearly established Supreme Court precedent, a federal court may only look to the holdings, as opposed to dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision.  *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003); *Williams*, 529 U.S. at 412.

## V.  Analysis

### A.  Insufficient Evidence Claim

In his first claim for habeas-corpus relief, Petitioner argues that insufficient evidence was presented to sustain his second-degree-murder conviction.  Petitioner argues that the facts do not support a finding of malice.

In *Jackson v. Virginia*, 443 U.S. 307 (1979), the Supreme Court established that the standard of review for a sufficiency of the evidence challenge must focus on whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.*, at 319 (emphasis in original); *Apanovitch v. Houk*, 466 F.3d 460, 488 (6th Cir. 2006).  Pursuant to 28 U.S.C. § 2254(d)(1), this Court must determine whether the state court's application of the *Jackson* standard was contrary to or an unreasonable application of Supreme Court precedent.  In making this determination, this Court must afford the state court's findings of fact a presumption of correctness unless it is established by clear and convincing evidence that the factual determination in the state court was erroneous.  28 U.S.C. § 2254(e)(1); *West v. Seabold*, 73 F.3d 81, 83 (6th Cir.1996), *cert. denied*, 116 S.Ct. 2569 (1996).

13

The Michigan Court of Appeals, the last state court to issue a reasoned opinion regarding

Petitioner's sufficiency of the evidence claim, stated in relevant part:

> In reviewing the sufficiency of the evidence, this Court must view the evidence in the light most favorable to the prosecutor and determine whether a rational trier of fact could find that each essential element of the crime was proven beyond a reasonable doubt. *People v. Johnson*, 460 Mich. 720, 723; 597 NW2d 73 (1999). This Court will not interfere with the jury's role of determining intent, the weight of evidence, or the credibility of witnesses. *People v. Wolfe*, 440 Mich. 508, 514; 489 NW2d 748, *amended* 441 Mich. 1201 (1992); *People v. Avant*, 235 Mich.App 499, 506; 597 NW2d 864 (1999); *People v. Terry*, 224 Mich.App 447, 452; 569 NW2d 641 (1997).

> The elements of second-degree murder are: "(1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v. Goecke*, 457 Mich. 442, 463-464; 579 NW2d 868 (1998). Malice is defined as a state of mind consisting of "the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Id.* at 464. A defendant's intent or state of mind, like all the elements of a crime, may be shown by circumstantial evidence. *People v. Dumas*, 454 Mich. 390, 398; 563 NW2d 31 (1997). Second-degree murder is a general-intent crime to which a defense of voluntary intoxication is not available. *Goecke*, *supra* at 464; *People v. Langworthy*, 416 Mich. 630, 651; 331 NW2d 171 (1982).

> The evidence established that the victim was shot to death. Although defendant maintained that the gun discharged accidentally when the victim attempted to grab it as defendant was handing it to him, the physical evidence and testimony indicated that the gun was placed barrel first next to the victim's stomach when it discharged. A firearms expert testified that the weapon could not have fired without the trigger being pulled, even if the hammer had fallen accidentally as a result of rough handling. Moreover, testing revealed that the victim did not have visible gunpowder residue on his hands. According to the firearms expert, had the victim placed his hand on the "cylinder" area of the gun where the cartridges were loaded or near defendant's hand on the trigger well of the gun, visibly obvious powder burns would have been present. Viewed most favorably to the prosecution, the evidence was sufficient to enable the jury to infer that defendant placed the barrel of the gun on the victim's stomach and pulled the trigger, contradicting defendant's claim that the gun discharged while the victim was grabbing it from him. Thus, sufficient evidence of malice was presented to support defendant's conviction of second-degree murder.

14

*Britt*, No. 228017, 2002 WL 737867 at 1-2.

The Court finds that the Michigan Court of Appeals' resolution of Petitioner's sufficiency of the evidence claim was neither contrary to nor or an unreasonable application of clearly established federal law.  The Court of Appeals' decision cited case law which plainly incorporated the *Jackson* standard and explained and supported its conclusion that a rational trier of fact could have found Petitioner guilty beyond a reasonable doubt.

As the Michigan Court of Appeals noted, "the physical evidence and testimony indicated that the gun was placed barrel first next to the victim's stomach when it discharged."  *Britt*, No. 228017, 2002 WL 737867 at 1-2.  Against that backdrop, it was not unreasonable for the jury to believe the prosecution witnesses' accounts of the shooting rather than Petitioner's.  Petitioner provides no information which would call the Michigan Court of Appeals' credibility into doubt.

Therefore, according the state court's factual findings a presumption of correctness, *see* 28 U.S.C. § 2254(e)(1), this Court concludes that the Michigan Court of Appeals' decision that "sufficient evidence of malice was presented to support [Petitioner's] conviction of second-degree murder," *Britt*, No. 228017, 2002 WL 737867 at 1-2, did not "result[ ] in a decision that . . . involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Petitioner is therefore not entitled to habeas relief on sufficient of the evidence claim.

### B.  Prosecutorial Misconduct Claim

In his second claim, Petitioner asserts that, because the prosecutor engaged in misconduct by eliciting testimony from law enforcement officers, and by emphasizing, during closing

arguments, that Petitioner had invoked his right to remain silent and to counsel at the scene and in the aftermath of the alleged crimes, he is entitled to habeas relief.

The Michigan Court of Appeals, the last court to issue a reasoned decision on this issue stated in pertinent part:

> Defendant argues that reversal is required because of a number of instances in which either witnesses for the prosecution or the prosecutor himself commented on defendant's initial decision to invoke his right to remain silent. Because defendant did not object to the challenged evidence or the prosecutor's comments at trial, we review this issue for plain error affecting defendant's substantial rights. *People v. Carines*, 460 Mich. 750, 763-764; 597 NW2d 130 (1999).
>
> While it is generally inappropriate for the prosecution to comment regarding an accused's exercise of the constitutional privilege against self-incrimination, *People v. Truong*, 218 Mich.App 325, 336; 553 NW2d 692 (1996), evidence of a defendant's silence may be admitted at trial to contradict the defendant's trial testimony that he cooperated with the police. *People v. Vanover*, 200 Mich.App 498, 503; 505 NW2d 21 (1993). Here, defense counsel, in his opening statements, maintained that defendant "cooperated a hundred percent with the police." Considered in this context, defendant has failed to show that the challenged references amounted to plain error.
>
> Furthermore, it is apparent from the surrounding context that the references to defendant's decision to invoke his right to silence were not injected for an improper purpose, but rather, were intended to refute defendant's assertion of intoxication. Thus, the evidence did not affect defendant's substantial rights. Further, defendant has not established that he was prejudiced by counsel's failure to object to the evidence, where the evidence showed that despite his invocation of his rights, defendant cooperated with police and made voluntary statements.

*Britt*, No. 228017, 2002 WL 737867 at 1-2.

In dismissing Petitioner's claim, the state appellate court relied upon a state procedural bar–Petitioner's failure to timely object to the prosecutor's conduct at trial. Thus, Petitioner's claims are barred for review.

A state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In this case, Petitioner alleges ineffective assistance of counsel as cause to excuse his default. Even assuming that Petitioner could establish that counsel erred, by failing to object, however, he cannot establish that he was prejudiced as his claims of prosecutorial misconduct lack merit.

Before habeas corpus relief becomes available, prosecutorial misconduct must be so egregious as to deny the petitioner a fundamentally fair trial. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643-45 (1974). In this regard, "the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). Specifically, the Sixth Circuit takes into account "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive, whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused." *Hamblin v. Mitchell*, 354 F.3d 484, 494-95 (6th Cir. 2003). "Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004).

The inquiry in this case is directed to deciding whether the state court's determination of the issue was an unreasonable application of clearly established federal law. *Frazier v. Huffman*, 343 F.3d 780, 791 (6th Cir.), *as amended on reh'g*, 348 F.3d 174 (2003), *cert. denied*, 124 S.Ct. 1825 (2004); *United States v. Payne*, 2 F.3d 706, 715-16 (6th Cir. 1993) (inflammatory remarks

17

in opening and closing statements and throughout trial were not cured by cautionary

instructions).  The giving of cautionary instructions also factors into the calculus of determining

whether fundamental fairness was denied.  *Serra*, 4 F.3d at 1356.  Extensive prosecutorial

misconduct during trial and during closing argument justifies the granting of a writ of habeas

corpus.  *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000).

However, where the evidence pointing to the defendant's guilt is strong and the

prosecutor's improper comments go to the nature and intent of the crime, not to the defendant's

guilt or innocence of the crime, the improper comments may be "error, but the jury would

probably have returned the verdict of guilty anyway," and habeas relief is not warranted.

*Hamblin*, 354 F.3d at 495.

The Sixth Circuit has adopted a two-step approach in order to determine whether a

defendant is entitled to a new trial based upon improper prosecutorial remarks made in closing

argument.  *See United States v. Carroll*, 26 F.3d 1380, 1385-90 (6th Cir. 1994); *accord United

States v. DeJohn*, 368 F.3d 533, 548 (6th Cir. 2004).  First, the court should determine whether

the remarks were improper by examining the context of the remarks and existing precedent.  *Id.*,

at 1387-89.  Second, it should determine whether the remarks were flagrant by applying the

factors enunciated in *United States v. Leon*, 534 F.2d 667, 678-83 (6th Cir. 1976).

> Flagrancy is determined by an examination of four factors: "1)
> whether the statements tended to mislead the jury or prejudice the
> defendant; 2) whether the statements were isolated or among a
> series of improper statements; 3) whether the statements were
> deliberately or accidentally before the jury; and 4) the total
> strength of the evidence against the accused."

*Boyle*, 201 F.3d at 717 (quoting *Carroll*, 26 F.3d at 549, 550).  "[T]o constitute the denial of a

fair trial, prosecutorial misconduct must be 'so pronounced and persistent that it permeates the entire atmosphere of the trial,' or 'so gross as probably to prejudice the defendant." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997).

The Michigan Court of Appeals reviewed this issue for plain error and found that the challenged references did not amount to plain error.  This Court finds that the Michigan Court of Appeals' decision is consistent with United States Supreme Court precedent and constitutes a reasonable application thereof.  Therefore, under the circumstances of this case, the prosecutor's conduct was not so egregious or flagrant as to deprive Petitioner of a fair trial.  Accordingly, Petitioner is not entitled to federal-habeas-corpus relief with respect to his prosecutorial misconduct claims.

### C.  Ineffective Assistance of Counsel Claim

In his third habeas claim, Petitioner alleges that trial counsel was ineffective for failing to object to the prosecutor's alleged misconduct.

To establish ineffective assistance of counsel, it must be shown that counsel's performance was deficient and that the deficient performance prejudiced the defense so as to render the trial unfair and the result unreliable.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

With respect to the performance prong of the *Strickland* test, a petitioner must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance.  *Strickland*, 466 U.S. at 690.  The reviewing court's scrutiny of counsel's performance is highly deferential.  *Id.*, at 689.  The court must recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise

19

of reasonable professional judgment.  *Id.*, at 690.

To satisfy the prejudice prong under *Strickland*, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.*, at 694.  A reasonable probability is one that is sufficient to undermine confidence in the outcome.  *Id.*  "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *McQueen v. Scroggy*, 99 F.3d 1302, 1311-12 (6th Cir. 1996) (quoting *Strickland*, 466 U.S. at 686).

The Michigan Court of Appeals, the last court to issue a reasoned opinion regarding this issue, stated:

> Defendant argues that he was denied the effective assistance of counsel due to the admission of certain statements he made to the police.
>
> To establish ineffective assistance of counsel, defendant must show that counsel's performance was deficient and that he was prejudiced by the deficiency. *Strickland v. Washington*, 466 U.S. 668, 687; 104 S Ct 2052; 80 L.Ed.2d 674 (1984); *People v. Pickens*, 446 Mich. 298, 302-303; 521 NW2d 797 (1994).
>
> Limiting our review to the existing record, *People v. Thew*, 201 Mich.App 78, 90; 506 NW2d 547 (1993), it is apparent that a motion to suppress would not have been successful with regard to the statements made by defendant on the evening of the offense while seated in the police vehicle.  Even if defendant was in custody for purposes of *Miranda* when he made the statements, *People v. Hill*, 429 Mich. 382, 384; 415 NW2d 193 (1987); *People v. Zahn*, 234 Mich.App 438, 449; 594 NW2d 120 (1999), the evidence does not indicate that the statements resulted from any interrogation by the police.  *Rhode Island v. Innis*, 446 U.S. 291, 303; 100 S Ct 1682, 1689; 64 L.Ed.2d 297 (1980); *People v. Anderson*, 209 Mich.App 527, 532-533; 531 NW2d 780 (1995).  Rather, the record shows that the statements were spontaneously made by defendant.  Under these circumstances, *Miranda* warnings were not required, and the statements were not subject to suppression.  *People v. Fisher*, 166 Mich.App 699, 710; 420 NW2d 858 (1988).

Defendant's only claim of error with regard to the later written statement appears to be that the omission of the words "accident" or "accidental" allowed the prosecution to successfully argue that the statement was not supportive of defendant's claim that the shooting was accidental. Viewed as a whole, the written statement, while self-serving, put forth a theory of accident. We find no merit to the suggested claim that a hindsight review of trial counsel's choice of words should cause us to now conclude that defendant was denied the effective assistance of counsel. *See People v. LaVearn*, 448 Mich. 207, 216; 528 NW2d 721 (1995).

*Britt*, No. 228017, 2002 WL 737867 at 2.

The Michigan Court of Appeals did not address the issue of defense counsel's failure to object to the admission of certain testimony and the prosecutor's closing arguments to the jury.

The Sixth Circuit, in *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir. 2006), stated:

As a threshold matter, in a trial of any size, numerous potentially objectionable events occur. "[T]he Constitution does not insure that defense counsel will recognize and raise every conceivable constitutional claim." *Engle v. Isaac*, 456 U.S. 107, 134, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). Moreover, experienced trial counsel learn that objections to each potentially objectionable event could actually act to their party's detriment. Learned counsel therefore use objections in a tactical manner. In light of this, any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial to a client that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice. *See Hodge v. Hurley*, 426 F.3d 368, 376 (6th Cir.2005) ("[C]ounsel's failure to object to any of the numerous improper statements in the prosecution's closing argument is well outside [professional norms].") (emphasis in original).

Even assuming, *arguendo*, that Petitioner is able to prove that it was error for counsel to fail to object to the above-referenced evidence, Petitioner has failed to show how (1) the failure to object amounted to a constitutional deprivation of counsel, and (2) how Petitioner was prejudiced by the admission–*i.e.*, why this Court should find that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

21

been different." *Strickland*, 466 U.S. at 694. Petitioner is not entitled to a presumption of prejudice unless it can be said that his counsel "fail[ed] meaningfully to oppose the prosecution's case." *Florida v. Nixon*, 543 U.S. 175, 179 (2004).

Petitioner presents no argument in support of the prejudice prong beyond his conclusory assertion that the error denied him his right to the effective assistance of counsel. In light of the evidence presented, it is difficult to conclude that there exists a reasonable probability that but for the alleged error, the result of either the guilt or penalty phases would have been different.

Here, the Court finds that Petitioner's claims show no grounds for habeas relief premised on ineffective assistance of counsel. The United States Supreme Court noted in *Doyle v. Ohio*, 426 U.S. 610, 620, n. 11 (1976):

> It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest. *Cf. United States v. Fairchild*, 505 F.2d 1378, 1383 [5th Cir. 1975].

This Court also finds that Petitioner's statements were properly admitted to refute the inference that he had fully cooperated in the investigation:

> The prohibition against reference to post-arrest silence does not allow the defendant to "freely and falsely create the impression that he has cooperated with police when, in fact, he has not." *United States v. Fairchild*, 505 F.2d 1378, 1383 (5th Cir.1975) (cited with approval in *Doyle*). Thus, reference to post[-]arrest silence is permissible for rebuttal purposes when a defendant implies that he cooperated with the police, *see United States v. Gant*, 17 F.3d 935, 941-42 (7th Cir.1994), or implies that he gave police an exculpatory statement, *see Leecan v. Lopes*, 893 F.2d 1434, 1441-42 (2d. Cir.), *cert. denied*, 496 U.S. 929, 110 S.Ct. 2627, 110 L.Ed.2d 647 (1990). []. We therefore find that this testimony invited impeachment, and that the prosecutor did not make improper use of [] silence.

*Earnest v. Dorsey*, 87 F.3d 1123, 1135 (10th Cir. 1996) (footnote omitted).

22

Against that backdrop, the Court finds that the prosecutor's comments were not improper. For that reason, trial counsel was not ineffective for failing to make a meritless objection.  Thus, Petitioner is not entitled to habeas relief on his ineffective assistance of counsel claim.

### VI.  Conclusion

For the reasons stated above, this Court concludes that Petitioner is not entitled to federal habeas relief on the claims presented in his petition.

Accordingly:

**IT IS ORDERED** that Petitioner's "Petition for Writ of Habeas Corpus" is **DENIED WITH PREJUDICE**.  (Dkt. # 1.)


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  April 14, 2009

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on April 14, 2009, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager

23